565 So.2d 1293 (1990)
Frank Lee SMITH, Petitioner,
v.
Richard L. DUGGER, Respondent.
Frank Lee SMITH, Appellant,
v.
STATE of Florida, Appellee.
Nos. 75038, 75208.
Supreme Court of Florida.
February 15, 1990.
Rehearing Denied September 6, 1990.
*1294 Larry Helm Spalding, Capital Collateral Representative, and Thomas H. Dunn and K. Leslie Delk, Staff Attys., Office of the Capital Collateral Representative, Tallahassee, for petitioner/appellant.
Robert A. Butterworth, Atty. Gen., and Robert J. Krauss, Asst. Atty. Gen., Tampa, for respondent/appellee.
PER CURIAM.
Frank Lee Smith petitions this Court for a writ of habeas corpus, appeals the trial court's denial of his motion for postconviction relief pursuant to rule 3.850, Florida Rules of Criminal Procedure, and seeks a stay of his scheduled execution. We have jurisdiction. Art. V, § 3(b)(1), (9), Fla. Const. We deny the petition for habeas corpus, reverse in part the summary denial of the rule 3.850 motion, and grant a stay of execution.
Smith was convicted of the April 17, 1985, sexual battery and first-degree murder of an eight-year-old girl. The jury unanimously recommended death, and the trial court imposed the death penalty on May 6, 1986. This Court affirmed. Smith v. State, 515 So.2d 182 (Fla. 1987). The Governor signed a death warrant on October 16, 1989, and the execution was scheduled for January 16, 1990. Smith filed a motion in the trial court on November 17, 1989, to stay execution pending consideration of his motion for postconviction relief. Smith also requested a stay of execution from this Court pending disposition of his writ of habeas corpus. The trial court summarily denied the motions for stay and postconviction relief, and Smith appealed.
Smith raises twenty-five issues on appeal of the denial of his rule 3.850 motion. We reject as procedurally barred all those that were[1] or should have been[2] *1295 raised on direct appeal. Smith claims that his trial counsel was ineffective for the following reasons: He should have challenged witness identifications; he should have sought the pretrial appointment of an expert to examine vaginal smears; he should have obtained expert testimony concerning Smith's poor eyesight; he should have objected to instances of prosecutorial misconduct; he failed to present evidence of Smith's deprived childhood at sentencing; he failed to develop Smith's claims of mental incompetency. The trial court properly rejected these claims. Witness identification was vigorously challenged by trial counsel; evidence indicated that the vaginal smears were insufficient for further testing; prosecutorial misconduct was challenged; mental incompetency was pursued; the allegations of a deprived childhood failed to show extensive deprivation or abuse; and failure to develop eyesight evidence may have been the result of a reasonable strategic decision to concentrate on other matters. See Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Smith's allegations that the police lied about and withheld evidence concerning other suspects are insufficiently supported.
Smith asserts that victim impact statements were improperly presented during the testimony of the victim's mother, during the state's closing argument, and in the presentence investigation report. See Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). We note that the testimony of the mother and statements by the prosecutor took place during the guilt, not sentencing, phase of the trial. The mother cried when she identified Smith and the prosecutor later pointed out that it had been "tough" for her to testify. The trial judge obviously felt that the probative value of the identification clearly outweighed its prejudicial effect. We find no error. See §§ 90.402-.403, Fla. Stat. (1987). As for the victim impact statement contained in the presentence investigation report, no objection was raised and the issue is procedurally barred. Parker v. Dugger, 550 So.2d 459 (Fla. 1989). The remaining issues raised in the rule 3.850 motion are without merit.[3]
Smith asserts that the trial court should have held an evidentiary hearing to evaluate new evidence. We agree. At trial, the state's case against Smith consisted primarily of an allegedly inculpatory statement made by Smith and identifications of Smith made by three witnesses. Dorothy McGriff, the victim's mother, testified that as she drove up to her home at 11:30 p.m., she saw a man standing outside one of the windows. She observed the man from a distance and could not identify his face. She later identified Smith based only on his shoulders. Chiquita Lowe testified that as she drove past the victim's house, a man flagged her down and asked her for fifty cents. She "looked dead at him" from a distance of eighteen inches and later conclusively identified Smith as the man. Gerald Davis testified that as he walked past the victim's house, a man engaged him in a *1296 conversation for several minutes. The street lights were out and Davis could not remember "how the guy looked." He testified that Smith looked like the man but he could not identify him positively. Of the witness identifications presented at trial, that of Lowe clearly was the most credible. After the jury had deliberated for five hours, it requested that it be permitted to rehear Lowe's testimony. The court declined. One hour later, the jury repeated its request. The court acceded. Two and one-half hours later, the jury rendered its verdict.
In his motion for reconsideration of rehearing, Smith submitted an affidavit by Lowe in which she swears that the man she saw was not Smith but Eddie Lee Mosley, a former suspect who has since been implicated in numerous rape/murders and sexual batteries occurring during the same time period and in the same geographical area as the instant crime. The affidavit reads:
I, Chiquita Lowe, having been duly sworn or affirmed, do hereby depose and say:
1. My name is Chiquita Lowe and I live in Ft. Lauderdale, Florida. I am presently twenty-four years old.
2. In 1985, I testified during a murder trial. A little girl was raped and killed near my grandmother's house. I saw the man in the street right before the crime happened.
3. In 1985, I told the police detectives and the state attorney about how the man asked me for money. I told them that I only saw the man for an instant and that the only things I remembered were the droopy eye, scraggly hair, pot marks on his face, and the ring on his finger.
4. The police detectives and the attorney told me the man had a scar under his eye. I never saw a scar and they knew that. The state attorney told me that the man on trial had committed several crimes just like the one that happened near my grandmother's house. The state attorney also told me that the man on trial was dangerous, guilty of the crime, and needed to be taken off the streets.
5. While I was in the courtroom telling about what I saw, I knew that the man on trial was too thin to be the same man I saw on the street. The police detectives and the state attorney put so much pressure on me to testify against the man on trial.
6. The state attorney told me not to worry about my testimony because the man would be locked up and electrocuted the following May. He also pointed out the man's entire family to me. I was just feeling so pressured.
7. I have not forgotten about the trial and every few months I picture the man's face in my mind. I also remember how sorry I felt for the little girl.
8. On December 10, 1989, I was shown a photo [of Eddie Lee Mosley] and asked if this was the man who approached me and asked for fifty cents back in 1985. When I looked at the picture everything came back to me. The photo is attached to this affidavit. The man in the photo is without a doubt the man I saw. I know that he is not the same man who was on trial for the little girl's murder. I am so sorry that the wrong man is in prison and sentenced to death. I had doubts in the courtroom but I was under so much pressure. Also, the state attorney told me about how dangerous the man was and how he needed to be locked up forever.
9. I feel so bad that I did not tell the state attorney about my doubts. I did not know what to do. I felt a lot of pressure to say that the man on trial was the man I saw, even though I had doubts, and the man's hair did look the same.
10. I swear on my mother's grave that the man in the photo is the man I saw on the street the night when the little girl was raped and killed. I identified the wrong man in the courtroom.
*1297 We conclude that the trial court erred in failing to conduct an evidentiary hearing to evaluate this newly discovered evidence.
Smith's petition for writ of habeas corpus raises fourteen[4] of the same issues noted above but frames the claims in terms of ineffective assistance of appellate counsel. All these issues, however, either were not preserved for review,[5] were raised on direct appeal,[6] or are without merit.[7] Appellate counsel was not deficient for failing to raise them.
Based on the foregoing, we deny the petition for writ of habeas corpus. We affirm the summary denial of the rule 3.850 motion with the exception of the claim relating to newly discovered evidence. We grant a stay of execution and remand the case to the trial court so that it can conduct an evidentiary hearing to evaluate new evidence within sixty days of the filing of this opinion. We reverse the trial court's summary denial of Smith's motion for an order of insolvency and direct the trial court to issue the order so that Smith can continue to be represented by the Office of the Capital Collateral Representative in this proceeding.[8]
It is so ordered.
EHRLICH, C.J., and OVERTON, SHAW, BARKETT, GRIMES and KOGAN, JJ., concur.
McDONALD, J., concurs in part and dissents in part: "I would deny all relief."
NOTES
[1] The issues that were raised on direct appeal include the following claims:

1) The identifications of Smith by witnesses were unreliable.
2) Smith was incapable of waiving his rights prior to making his statement to police.
3) The trial court failed to find mitigators clearly established in the record.
4) The heinous, atrocious, or cruel aggravator was improperly applied.
5) The state committed discovery violations.
[2] The issues that should have been raised on appeal (had they been preserved where necessary) include the following claims:

1) The jury was instructed on the statutory mental health mitigating factors. It was then told it could consider "any other aspect" of Smith's character. This could mislead the jury into believing that it could not consider mental health factors in relation to nonstatutory mitigating circumstances.
2) The trial court failed to properly limit the instruction on pecuniary gain.
3) The trial court failed to properly limit the instruction on prior violent felony.
4) The penalty phase instructions improperly shifted the burden to Smith to show that death was inappropriate.
5) Smith's prior convictions were unconstitutionally obtained.
6) The trial court should have given Smith's requested instruction which stated that the jury could constitutionally consider mercy.
7) Every felony murder involves the finding of an automatic aggravating factor.
8) The prosecutor improperly shifted the burden to Smith in closing argument.
9) The state adduced irrelevant evidence.
[3] The remaining meritless issues contain the following claims:

1) The mental health experts who evaluated Smith conducted incompetent exams.
2) Smith was incompetent to stand trial.
3) The instruction on the heinous, atrocious, or cruel aggravating factor is improperly vague under Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). See Smalley v. State, 546 So.2d 720 (Fla. 1989).
4) The cold, calculated, and premeditated aggravating circumstance is impermissibly vague under Maynard.
5) Under Florida Rule of Criminal Procedure 3.850, Smith had two years after his death sentence became final to file a motion for postconviction relief. Because the governor signed the death warrant prior to the running of this period, Smith was deprived of his rights. See Cave v. State, 529 So.2d 293 (Fla. 1988).
6) This Court should have remanded for resentencing after it found the cold, calculated, and premeditated aggravator inapplicable on direct appeal.
[4] The petition's fifteenth claim alleges that the evidence was insufficient to support the conviction. This was addressed on direct appeal.
[5] The issues that were not preserved include the following claims:

1) The jury was instructed on the statutory mental health mitigating factors. It was then told it could consider "any other aspect" of Smith's character. This could mislead the jury into believing that it could not consider mental health factors in relation to nonstatutory mitigating circumstances.
2) The trial court failed to properly limit the instruction on pecuniary gain.
3) The trial court failed to properly limit the instruction on prior violent felony.
4) The penalty phase instructions improperly shifted the burden to Smith to show that death was inappropriate.
[6] The following claims were addressed on direct appeal:

1) The trial court failed to find mitigators clearly established in record.
2) The heinous, atrocious, or cruel aggravator was improperly applied.
3) The state committed discovery violations.
[7] The meritless claims include the following:

1) Victim impact statements were improperly presented.
2) The trial court was required to give the requested instruction which stated that the jury was constitutionally permitted to consider mercy.
3) The instruction on the heinous, atrocious, or cruel aggravator is improperly vague under Maynard.
4) The cold, calculated, and premeditated aggravating circumstance is impermissibly vague under Maynard.
5) This Court should have remanded for resentencing on direct appeal.
6) Every felony murder involves the finding of an automatic aggravating factor.
[8] Smith was declared indigent on direct appeal and has remained incarcerated since the time of his arrest.